# UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BARRY D. MILLER, | 1:03-CV-06638 LJO HC |
| Petitioner, | ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS |
| v. | [Doc. #1] |
| EDWARD S. ALAMEIDA, JR., Warden, | ORDER DIRECTING CLERK OF COURT TO ENTER JUDGMENT |
| Respondent. | |

Petitioner is a state prisoner proceeding pro se with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. The parties having voluntarily consented to exercise of Magistrate Judge jurisdiction pursuant to 28 U.S.C. § 636(c)(1), by order dated March 9, 2004, this case was assigned to the Magistrate Judge for all purposes, including entry of final judgment. Due to the death of Magistrate Judge Hollis G. Best and the appointment of Magistrate Judge William M. Wunderlich, by order dated May 2, 2004, this case was reassigned to the undersigned for all further proceedings.

**PROCEDURAL BACKGROUND**

Petitioner is currently in the custody of the California Department of Corrections pursuant to a judgment of the Superior Court of California, County of Madera, following his conviction by jury trial on January 31, 2002, of infliction of corporal injury on a cohabitant which caused great bodily

injury (Cal. Penal Code §§ 273.5(a), 12022.7(c)), dissuading or preventing the victim from reporting a crime (Cal. Penal Code § 136.1(c)(1)), assault with a deadly weapon (Cal. Penal Code § 245(a)(1)), and making a criminal threat which would result in death and great bodily injury (Cal. Penal Code § 442). See Exhibit 1, Respondent's Answer to Petition (hereinafter "Answer"). On February 8, 2001, Petitioner was sentenced to a determinate term of ten years and eight months in state prison. Id.

Thereafter, Petitioner filed a notice of appeal with the California Court of Appeal, Fifth Appellate District (hereinafter "5th DCA"). On May 2, 2003, the 5th DCA issued an unpublished opinion modifying the judgment pursuant to Cal. Penal Code § 654 to stay the eight month term imposed for making a criminal threat. See Exhibit 3, Answer. The judgment was affirmed in all other respects. Id.

On June 3, 2003, Petitioner filed a petition for review in the California Supreme Court. See Exhibit 4, Answer. On July 9, 2003, the petition was summarily denied without comment. Id.

On November 20, 2003, Petitioner filed the instant federal habeas petition in this Court. On February 11, 2004, Respondent filed a motion to dismiss the petition as a mixed petition containing exhausted and unexhausted claims. Petitioner filed a response to the motion on March 3, 2004, wherein he conceded that his petition contained unexhausted claims and requested that the unexhausted claims be withdrawn. On March 26, 2004, Magistrate Judge Sandra M. Snyder granted Petitioner's request to withdraw the unexhausted claims and dismissed those claims from the petition. Magistrate Snyder then ordered Respondent to file a response to the following two remaining claims: 1) Petitioner claims trial counsel was ineffective in failing to request CALJIC No. 2.23; and 2) Petitioner claims trial counsel was ineffective in failing to object to hearsay evidence.

On June 25, 2004, Respondent filed an answer to the petition. On July 26, 2004, Petitioner filed a traverse.

**FACTUAL BACKGROUND**

The Court hereby adopts the facts as summarized by the 5th DCA in its opinion dated May 2, 2003:

Marie White and Kathy B. had been friends for six or seven years. At approximately

1:00 a.m. on August 12, 2001, White received a telephone call from Kathy. Kathy told White in a frightened whisper that the man she was living with had grabbed her head and slammed it against the side of the house, knocking out some of her teeth. She stated that she was in her room hiding, and that her boyfriend was sitting in the living room. Kathy explained that she was afraid of him because she thought he was going to kill her and asked White to call the police. White ended her conversation with Kathy, called the police and then called Kathy back using the three-way feature on her telephone to connect all of the parties. The police spoke to Kathy and tried to calm her down.

Officer Wayson Juarez was dispatched to the victim's home in response to the call. He contacted Kathy when she answered the door. Juarez observed that Kathy had a red mark over her forehead and on her upper lip, and noticed that her lower lip was bleeding. He followed Kathy into her room and observed appellant sitting in the living room drinking a beer. Upon entering the bedroom, the officer picked up the telephone receiver and informed White that Kathy was "okay."

The officer questioned Kathy about her injuries and Kathy told him that she and appellant had been in an argument earlier in the day. She wanted to leave the residence, so she asked appellant to drive her to her sister's home and he complied. When they arrived, Kathy's sister was not at home so Kathy got back into the vehicle. At that point appellant became angry with Kathy, took a four-inch buck knife from his pocket, held it to her throat and said "I'll kill you bitch." Appellant then began driving back to their Madera residence. Kathy was in fear during the ride back because she did not know what appellant was going to do next.

When they arrived at the residence, Kathy exited the vehicle and walked toward the house. Appellant grabbed Kathy by the back of her neck and slammed her face into the side of the house causing her to lose three or four teeth. Her knees buckled and she was confused. When she regained her balance, she began walking toward the front door and appellant grabbed her by the front of her neck and slammed her into the front door. Kathy was able to get the front door open and ran into her bedroom.

Once in the room Kathy attempted to call 911, but appellant pulled the telephone from her hand and threw it against the wall, breaking it. At that point, appellant left the bedroom, went into the living room, and began drinking a beer. Kathy used a second cordless phone to call White and explained to her what had happened.

After hearing Kathy's version of events, Juarez placed appellant in custody and removed him from the residence. Kathy informed Juarez that appellant still had the buck knife in his pocket, and a search of appellant revealed the knife in his front pocket. The officer also observed a broken telephone lying on the bedroom floor. Kathy told Juarez that appellant was her boyfriend.

Juarez stated that Kathy did not exhibit any signs of intoxication nor did she smell of alcohol when he interviewed her. After appellant was arrested Juarez had Kathy sign a confidentiality form, but Kathy refused to sign an emergency protective order because she stated that she did not want to stay at the house. Kathy explained that she feared appellant would be released from jail and would return to the house and hurt her. The officer transported Kathy to a safe house for the night.

A further inspection of Kathy's injuries revealed numerous cuts inside her upper and lower lips, and a five-inch, thin red mark on her neck. The red mark appeared fresh and in the officer's opinion was not a scratch mark. White stated that Kathy's teeth were not perfect before the incident; however, they were not 'all knocked out like they are now.'

Juarez did not recall seeing a pit bull puppy at the residence that evening, and stated that he did not observe any blood or teeth where Kathy stated she was attacked.

White explained that Kathy lived with two men. One was a truck driver whom Kathy was house sitting for, and the other was a man White 'guess[ed]' was Kathy's boyfriend because Kathy had told her she was sleeping with him. White had never met Kathy's boyfriend in person.

**Defense Case**

Kathy testified that she considers appellant her roommate and that the two were never in any sort of dating relationship. She stated that appellant sleeps in the living room on a mattress. She also denied ever telling anyone else that appellant was her boyfriend. Instead, she claimed that the man who owns the house where she lives, Anthony Higuera, is her boyfriend. She stated that she has told White in the past that Higuera is her boyfriend.

On the night in question, appellant took his daughter, Kastina Sanders, to Fresno to do some shopping. Kathy went along because she wanted to visit her sister. They dropped Sanders off at Fulton Mall and proceeded to Kathy's sister's home. On the way to her sister's house they stopped so Kathy could buy beer. Kathy's sister was not home, and they went to another store to buy more beer before picking Sanders up at her husband's house. The trio then headed back to Madera.

On the way back home, Kathy dropped a cigarette on the floorboard of the truck and bent down to pick it up. Just as she was beginning to sit up, appellant slammed on the brakes causing her head to hit the windshield. The impact broke the windshield and caused her head to hurt so badly she began crying. Appellant laughed and called her a 'cry baby.' This angered Kathy and she began arguing with appellant.

Upon returning home, Kathy and appellant continued to argue. During the argument White called and Kathy told her appellant had slammed her into the side of the house. Kathy was unclear as to exactly what she told White because she claimed that she had been drinking. Kathy was still quite angry with appellant while speaking with White, so she threw the cordless telephone at appellant, missing him but hitting the wall and breaking the telephone. White subsequently called Kathy back. Kathy denied ever calling White that evening, stating she had a 12-mile radius long distance restriction on her telephone.

Kathy stated that appellant never pulled a knife or threatened her. She also testified that he never hit her or threw her against the house. Instead, she said she made up those allegations because she was mad at him and because he would not leave the house. She also claimed that her only injury was the bump to her forehead; she did not sustain any injuries to her mouth or lips. Additionally, Kathy testified that her teeth are in poor condition due to neglect and decay. Her dentist explained to her that she had bone loss and severe decay of her teeth and recommended pulling all of her teeth and replacing them with dentures. Kathy also stated that she had a pit bull puppy and that she had received scratches from playing with it.

Kathy admitted speaking with the police on the night in question, although she stated the first time she saw the officer was in her bedroom. When she saw the officer, she was lying on her bed drinking a beer. She told the officer that appellant had assaulted her because she wanted appellant removed from the house. The officer took her somewhere that night, and in the morning she returned home.

Sanders testified that on the night in question appellant and Kathy took her to Fresno to go shopping. They dropped her off at Manchester Mall and Kathy and appellant went to Kathy's sister's house. When they picked her up later that evening, they headed back to

Madera. On the way back they were drinking alcohol. Kathy dropped a cigarette on the floor and bent over to pick it up, when appellant slammed on the brakes to avoid hitting another car. The sudden braking caused Kathy to hit her head on the windshield. Sanders and appellant laughed at Kathy, and appellant called her a 'cry baby' and told her to stop whining. Kathy became angry at appellant.

When they arrived at the house, Sanders stated appellant did not assault Kathy; rather, the two went to their separate rooms. However, Kathy was yelling and slamming doors because she was mad at appellant. Shortly thereafter, Sanders received a call and reported to work. Sanders never saw appellant assault Kathy or threaten her with a knife. She opined that by the time they returned home Kathy was 'sloppy drunk.'

**Prosecutions' Rebuttal**

White testified that Kathy had previously told her she had a sexual relationship with appellant. Specifically, Kathy stated that she had 'met this guy and said the sex was good.' She knew she was referring to appellant because she used his name at the time, although White was unable to recall the name at the time of trial. Kathy also referred to appellant as her boyfriend.

After the incident, Kathy told White not to answer a subpoena for the case if she got one. White opined that she and Kathy were no longer friends because of appellant. Kathy never told her that Higuera was her boyfriend.

White admitted that she was currently on felony probation for burglary.

See pp. 2-7, Exhibit 3, Answer.

## DISCUSSION

**I. Jurisdiction**

Relief by way of a petition for writ of habeas corpus extends to a person in custody pursuant to the judgment of a state court if the custody is in violation of the Constitution or laws or treaties of the United States. 28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams v. Taylor, 529 U.S. 362, 375 fn.7 (2000). Petitioner asserts that he suffered violations of his rights as guaranteed by the U.S. Constitution. In addition, the conviction challenged arises out of the Madera County Superior Court, which is located within the jurisdiction of this court. 28 U.S.C. § 2254(a); 2241(d). Accordingly, the Court has jurisdiction over the action.

On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its enactment. Lindh v. Murphy, 521 U.S. 320 (1997), *cert. denied,* 522 U.S. 1008 (1997); Jeffries v. Wood, 114 F.3d 1484, 1499 (9th Cir. 1997), *quoting* Drinkard v. Johnson, 97 F.3d 751, 769 (5th Cir.1996), *cert. denied,* 520 U.S. 1107 (1997), *overruled on other grounds by* Lindh v. Murphy, 521 U.S. 320 (1997)

1  (holding AEDPA only applicable to cases filed after statute's enactment).  The instant petition was
2  filed after the enactment of the AEDPA; thus, it is governed by its provisions.

3  **II.  Legal Standard of Review**

4        This Court may entertain a petition for writ of habeas corpus "in behalf of a person in custody
5  pursuant to the judgment of a State court only on the ground that he is in custody in violation of the
6  Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a).

7        The instant petition is reviewed under the provisions of the Antiterrorism and Effective Death
8  Penalty Act which became effective on April 24, 1996.  Lockyer v. Andrade,  538 U.S. 63, 70
9  (2003).  Under the AEDPA, an application for habeas corpus will not be granted unless the
10 adjudication of the claim "resulted in a decision that was contrary to, or involved an unreasonable
11 application of, clearly established Federal law, as determined by the Supreme Court of the United
12 States" or "resulted in a decision that was based on an unreasonable determination of the facts in
13 light of the evidence presented in the State Court proceeding." 28 U.S.C. § 2254(d); see Lockyer,
14 538 U.S. at 70-71; see Williams, 529 U.S. at 413.

15       As a threshold matter, this Court must "first decide what constitutes 'clearly established
16 Federal law, as determined by the Supreme Court of the United States.'" Lockyer, 538 U.S. at 71,
17 *quoting* 28 U.S.C. § 2254(d)(1).  In ascertaining what is "clearly established Federal law," this Court
18 must look to the "holdings, as opposed to the dicta, of [the Supreme Court's] decisions as of the time
19 of the relevant state-court decision." Id., *quoting* Williams, 592 U.S. at 412. "In other words, 'clearly
20 established Federal law' under § 2254(d)(1) is the governing legal principle or principles set forth by
21 the Supreme Court at the time the state court renders its decision." Id.

22       Finally, this Court must consider whether the state court's decision was "contrary to, or
23 involved an unreasonable application of, clearly established Federal law." Lockyer, 538 U.S. at 72,
24 *quoting* 28 U.S.C. § 2254(d)(1). "Under the 'contrary to' clause, a federal habeas court may grant the
25 writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a
26 question of law or if the state court decides a case differently than [the] Court has on a set of
27 materially indistinguishable facts." Williams, 529 U.S. at 413; see also Lockyer, 538 U.S. at 72.
28 "Under the 'reasonable application clause,' a federal habeas court may grant the writ if the state

court identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Williams, 529 U.S. at 413.

"[A] federal court may not issue the writ simply because the court concludes in its independent judgment that the relevant state court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Id. at 411. A federal habeas court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was "objectively unreasonable." Id. at 409.

Petitioner has the burden of establishing that the decision of the state court is contrary to or involved an unreasonable application of United States Supreme Court precedent. Baylor v. Estelle, 94 F.3d 1321, 1325 (9th Cir. 1996). Although only Supreme Court law is binding on the states, Ninth Circuit precedent remains relevant persuasive authority in determining whether a state court decision is objectively unreasonable. See Duhaime v. Ducharme, 200 F.3d 597, 600-01 (9th Cir.1999).

AEDPA requires that we give considerable deference to state court decisions. The state court's factual findings are presumed correct. 28 U.S.C. § 2254(e)(1). We are bound by a state's interpretation of its own laws. Souch v. Schaivo, 289 F.3d 616, 621 (9th Cir.2002), *cert. denied*, 537 U.S. 859 (2002), *rehearing denied*, 537 U.S. 1149 (2003).

**III.  Review of Petitioner's Claims**

**A.  Ground One**

In his first ground for relief, Petitioner claims his trial counsel was ineffective in failing to request CALJIC No. 2.23.

1.  Background[1]

Marie White testified at trial on behalf of the prosecution. During her testimony, it was revealed that she was currently on probation for felony burglary. The jury was instructed pursuant to CALJIC No. 2.20 as follows:

> Every person who testifies under oath or affirmation is a witness. You are the sole judges of the believability of a witness and the weight to be given to the testimony of each

---

[1] These facts are derived from the factual summary in the opinion of the 5th DCA. See pp. 9-11, Exhibit 3, Answer.

witness.

> In determining the believability of a witness, you may consider anything that has a tendency to prove or disprove the truthfulness of the testimony of the witness, including but not limited to any of the following:
>
> > The extent of the opportunity or ability of the witness to see or hear or otherwise become aware of any matter about which the witness testified;
> >
> > The ability of the witness to remember or to communicate any matter about which the witness testified;
> >
> > The character and quality of that testimony;
> >
> > The demeanor and manner of the witness while testifying;
> >
> > The existence or nonexistence of a bias, interest or other motive;
> >
> > The existence or nonexistence of any fact testified to by the witness;
> >
> > The attitude of the witness toward this action or toward the giving of testimony;
> >
> > A statement previously made by the witness that is consistent or inconsistent with his or her testimony;
> >
> > And an admission by the witness of untruthfulness.

See p. 9, Exhibit 3, Answer.

Petitioner claims trial counsel was ineffective in failing to also request CALJIC No. 2.23, which provides:

> The fact that a witness has been convicted of a felony, if this is a fact, may be considered by you only for the purpose of determining the believability of that witness. The fact of a conviction does not necessarily destroy or impair a witness's believability. It is one of the circumstances that you may take into consideration in weighing the testimony of that witness.

See p. 11, Exhibit 3, Answer.

2. Clearly Established Supreme Court Law

The law governing ineffective assistance of counsel claims is clearly established for the purposes of the AEDPA deference standard set forth in 28 U.S.C. § 2254(d). Canales v. Roe, 151 F.3d 1226, 1229 (9th Cir. 1998.) In a petition for writ of habeas corpus alleging ineffective assistance of counsel, the court must consider two factors. Strickland v. Washington, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064 (1984); Lowry v. Lewis, 21 F.3d 344, 346 (9th Cir. 1994). First, the petitioner must show that counsel's performance was deficient, requiring a showing that counsel made errors so

1  serious that he or she was not functioning as the "counsel" guaranteed by the Sixth Amendment.
2  Strickland, 466 U.S. at 687.  The petitioner must show that counsel's representation fell below an
3  objective standard of reasonableness, and must identify counsel's alleged acts or omissions that were
4  not the result of reasonable professional judgment considering the circumstances. Id. at 688; United
5  States v. Quintero-Barraza, 78 F.3d 1344, 1348 (9th Cir. 1995).  Judicial scrutiny of counsel's
6  performance is highly deferential.  A court indulges a strong presumption that counsel's conduct falls
7  within the wide range of reasonable professional assistance.  Strickland, 466 U.S. 668, 687, 104
8  S.Ct. 2052, 2064 (1984); Sanders v. Ratelle, 21 F.3d 1446, 1456 (9th Cir.1994).

9        Second, the petitioner must demonstrate that "there is a reasonable probability that, but for
10 counsel's unprofessional errors, the result ... would have been different," 466 U.S., at 694. Petitioner
11 must show that counsel's errors were so egregious as to deprive defendant of a fair trial, one whose
12 result is reliable.  Strickland, 466 U.S. at 688.  The court must evaluate whether the entire trial was
13 fundamentally unfair or unreliable because of counsel's ineffectiveness.  Id.; Quintero-Barraza, 78
14 F.3d at 1345; United States v. Palomba, 31 F.3d 1356, 1461 (9th Cir. 1994).

15       A court need not determine whether counsel's performance was deficient before examining
16 the prejudice suffered by the petitioner as a result of the alleged deficiencies.  Strickland, 466 U.S.
17 668, 697, 104 S.Ct. 2052, 2074 (1984).  Since the defendant must affirmatively prove prejudice, any
18 deficiency that does not result in prejudice must necessarily fail. However, there are certain instances
19 which are legally presumed to result in prejudice, e.g., where there has been an actual or constructive
20 denial of the assistance of counsel or where the State has interfered with counsel's assistance. See
21 Strickland, 466 U.S. at 692; United States v. Cronic, 466 U.S., at 659, and n. 25, 104 S.Ct., at
22 2046-2047, and n. 25 (1984).  Ineffective assistance of counsel claims are analyzed under the
23 "unreasonable application" prong of Williams v. Taylor, 529 U.S. 362 (2000).  Weighall v. Middle,
24 215 F.3d 1058, 1062 (2000).

25       3. Review of Claim by State Courts
26       This claim was first presented on direct appeal to the 5th DCA.  The 5th DCA denied the claim
27 on May 2, 2003, in a reasoned opinion.  See Exhibit 3, Answer.  The claim was then presented to the
28 California Supreme Court in a petition for review; however, the petition was summarily denied on

1  January 9, 2003. <u>See</u> Exhibit 4, Answer.  The California Supreme Court, by its "silent order"
2  denying review of the 5th DCA's decision, is presumed to have denied the claim presented for the
3  same reasons stated in the opinion of the 5th DCA.  <u>Ylst v. Nunnemaker,</u> 501 U.S. 797, 803 (1991).
4      The 5th DCA reviewed Petitioner's claim as follows:

> Appellant also contends that his counsel was derelict in failing to request the jury be instructed pursuant to CALJIC 2.23 and that compounded the error in failing to instruct the jury regarding a prior conviction. We disagree. CALJIC No. 2.23 provides:
>
>> The fact that a witness has been convicted of a felony, if this is a fact, may be considered by you only for the purpose of determining the believability of that witness. The fact of a conviction does not necessarily destroy or impair a witness's believability. It is one of the circumstances that you may take into consideration in weighing the testimony of that witness.
>
> This instruction informs the jury that it may only consider a witness's prior conviction as bearing on the witness's credibility and for no other purpose. It also rehabilitates the witness to some extent by informing the jury that a prior conviction does not necessarily destroy the witness's credibility. Failure to give such an instruction may be harmful where the witness who has been impeached with a prior conviction is testifying on behalf of the defense. However, in this case White testified for the prosecution and the defense argued the jury should not believe her testimony. Failure to provide the jury with this instruction did nothing to harm appellant's defense. On the contrary, had this instruction been given in this case, it would have specifically informed the jury that it could find White credible despite her prior conviction.
>
> Moreover, we note that White's testimony was corroborated by Juarez. White stated she was on the telephone with Kathy at the time the officer arrived, and Juarez confirmed that information. Furthermore, both White and Juarez testified that Kathy had told them that appellant was her boyfriend. White and Juarez both confirmed that Kathy had told them that appellant caused her injuries. Since Juarez, an uninterested party, confirmed White's testimony in key respects, the jury was informed regarding White's prior conviction and was told it could use anything having a tendency to bear on a witness's truthfulness in determining their credibility, we find that the failure to request any additional instructions did not reasonably have any impact on the outcome of the trial. Thus, trial counsel did not provide ineffective assistance of counsel.

21  <u>See</u> pp. 10-11, Exhibit 3, Answer.
22      4. Analysis
23      The state court's denial of Petitioner's claim is consistent with Supreme Court precedent. As
24  stated by the appellate court, the instruction would not have aided Petitioner. The purpose of giving
25  CALJIC No. 2.23 is to rehabilitate a defense witness who has been impeached with a prior
26  conviction. In this case, the witness was testifying for the prosecution. The instruction would have
27  informed the jury that they could find White credible despite her prior conviction. Therefore,
28  Petitioner would not have benefitted since giving the instruction would only have served to

rehabilitate the prosecution's witness. In addition, the jury was informed by CALJIC No. 2.20 that in determining the believability of a witness, they could "consider anything that has a tendency to prove or disprove the truthfulness of the testimony of the witness." Further, as pointed out by the appellate court, White's testimony was corroborated by Juarez.

Therefore, Petitioner has not shown counsel's failure to request this instruction to be erroneous, and he has not demonstrated any prejudice resulting therefrom. Thus, the state court rejection of this claim was not contrary to, or an unreasonable application of, clearly established Federal law. See 28 U.S.C. § 2254(d). The claim must be denied.

**B.  Ground Two**

Marie White testified that she guessed Petitioner was the victim's boyfriend based on the fact that the victim had told her she was involved in a sexual relationship with him. Officer Juarez also testified that the victim told him that Petitioner was her boyfriend. Petitioner alleges trial counsel was ineffective in failing to object to this testimony because it constituted inadmissible hearsay evidence and it was the only evidence which tended to establish that Petitioner and the victim were "cohabitants" within the meaning of Cal. Penal Code § 273.5.

1. Review of Claim by State Courts

This claim was also first presented on direct appeal to the 5th DCA and denied on May 2, 2003, in a reasoned opinion. See Exhibit 3, Answer. The claim was then presented to the California Supreme Court in a petition for review which was denied on January 9, 2003. See Exhibit 4, Answer. The California Supreme Court is presumed to have denied the claim presented for the same reasons stated in the opinion of the 5th DCA. Ylst v. Nunnemaker, 501 U.S. 797, 803 (1991).

The 5th DCA rejected the claim, stating:

> Assuming appellant is correct that the complained of statements constituted hearsay, we find his counsel's failure to object to the statements did not render his performance deficient. At trial, the victim testified that appellant was not her boyfriend and denied ever telling anyone that appellant was her boyfriend. In addition, she denied ever telling White she was in a sexual relationship with appellant. Presumably, trial counsel knew Kathy was going to testify in such a manner, as she testified as a witness in the defense case. Given this testimony, Kathy's statements to White and Juarez that appellant was her boyfriend, and her statement to White that she and appellant were involved in a sexual relationship, qualified as prior inconsistent statements. (Evid. Code, § 1235.) Because prior inconsistent statements are admissible for their truth (*People v. Hawthorne* (1992) 4 Cal.4th 43, 55, fn. 4; *People v. Johnson* (1992 ) 3 Cal.4th 1183, 1219), trial counsel cannot be deemed ineffective for failing

1  　　　to object to the admission of the statements. (See *People v. Price* (1991) 1 Cal.4th 324, 387
2  　　　[counsel does not render ineffective assistance by failing to make motions or objections that counsel reasonably determines would be futile].)

3  See p. 8-9, Exhibit 3, Answer.

4  　　2.  Analysis

5  　　　Initially, the Court notes that Respondent is correct in pointing out that the claim does not
6  rise to the level of a constitutional violation and is therefore not cognizable on federal habeas review.
7  The instant claim challenges the state court's interpretation of state law. Specifically, Petitioner
8  challenges the appellate court's ruling that the hearsay statements were admissible under the prior
9  inconsistent statement exception. Because Petitioner's claim is one of state law, it is not cognizable
10 on federal habeas. Estelle v. McGuire, 502 U.S. 62, 67, (1991) ("We have stated many times that
11 'federal habeas corpus relief does not lie for errors of state law.' "), *quoting* Lewis v. Jeffers, 497 U.S.
12 764, 780 (1990); Gilmore v. Taylor, 508 U.S. 333, 348-49 (1993) (O'Connor, J., concurring) ("mere
13 error of state law, one that does not rise to the level of a constitutional violation, may not be
14 corrected on federal habeas"); Sawyer v. Smith, 497 U.S. 227, 239 (1990), *quoting,* Dugger v.
15 Adams, 489 U.S. 401, 409 (1989) ([T]he availability of a claim under state law does not of itself
16 establish that a claim was available under the United States Constitution."); Tinsley v. Borg, 895
17 F.2d 520, 530 (9th Cir.1990), *cert. denied*, 498 U.S. 1091 (1991) ("incorrect" evidentiary rulings are
18 not the basis for federal habeas relief); Oxborrow v. Eikenberry, 877 F.2d 1395, 1399 (9th Cir.), *cert.*
19 *denied*, 493 U.S. 942 (1989) (Federal courts are bound by state court rulings on questions of state
20 law).

21 　　　In addition, it clear that the state court rejection comported with the federal standard. As
22 previously discussed, to demonstrate ineffective assistance of counsel, Petitioner must show that
23 counsel's representation fell below an objective standard of reasonableness, and must identify
24 counsel's alleged acts or omissions that were not the result of reasonable professional judgment
25 considering the circumstances. Strickland, 466 U.S. 668, 688. Second, Petitioner must demonstrate
26 that "there is a reasonable probability that, but for counsel's unprofessional errors, the result ... would
27 have been different," Id. at 694. Here, Petitioner has not demonstrated that counsel's failure to object
28 was error, as the state court found the statements would have been admissible under state law. For

the same reason, Petitioner has not demonstrated any prejudice from counsel's failure to object since any objection would have lacked merit.

Therefore, Petitioner has failed to demonstrate that the state court rejection of his claim was contrary to, or an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, or a decision that was based on an unreasonable determination of the facts in light of the evidence presented. See 28 U.S.C. § 2254(d). This claim must also be denied.

**ORDER**

Accordingly, IT IS HEREBY ORDERED:

1. The petition for writ of habeas corpus is DENIED; and

2. The Clerk of Court is DIRECTED to enter judgment for Respondent.

IT IS SO ORDERED.

**Dated:   June 23, 2006**                     **/s/ Lawrence J. O'Neill**
b9ed48                                         UNITED STATES MAGISTRATE JUDGE